UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO

| | |
|---|---|
| In re: | ) |
| | ) |
| | ) |
| Chee Wei Fong | ) Case No. 20-16813-JGR |
| | ) |
| Debtor. | ) Chapter 11 |
| | ) Subchapter V |

**DEBTOR'S OBJECTION TO PROOF OF CLAIM NO. 8**

**FILED BY ANGRGY BEAVERS LLC**

**I.      Background to Objection.**

1.     The Debtor and Ms. Chee Wein Fong were originally simply patrons of the Front Range Gun Club and befriended the owners of the club, Edward Klen and Stephen Klen ("Klens"), whom they trusted. After a series of discussions, the Debtor and Ms. Fong agreed in April of 2017 to purchase the Front Range Gun Club and the Property from the prior owners, Angry Beavers, LLC, Edward J. Klen, and Stephen J. Klen ("Klen"). Specifically, Happy Beavers, LLC purchased the Property from Angry Beavers, LLC. Angry Beavers, LLC is an entity wholly owned by the Klens. Armed Beavers, LLC purchased all membership interest and tangible personal property of the business from the Klens. Armed Beavers, LLC also purchased all inventory of the business from the Klens.

2.     The purchase involved the assumption of certain pre-existing debts of the sellers to Great Western Bank. The closing occurred on April 26, 2017. The bank disbursed $3,600,000.00 in the name of Happy Beavers LLC to the sellers of the business as a credit upon sellers' prior loan with Great Western Bank. The personal guarantees of Ms. Fong and Mr. Weingarten were obtained at that time.

1

3. The sale of the Front Range Gun Club eliminated over $3.4 million in debt owed by the Creditor and their affiliated entity Holstein Self Service Storage LLC to Great Western Bank. At the same time, the Debtor incurred over $3.4 million in debt to Great Western Bank and over $1.7 million in debt to these Creditor(s) as a result of the transaction.

4. Great Western Bank has asserted claims in the three ("LLC" entities") cases of Happy Beavers LLC, Case No. 20-14853 JGR, Armed Beavers LLC, Case No. 20-14963 JGR and Gunsmoke LLC, Case No. 10-14962 JGR in the amount of $3,380,611.92. In the Debtor's present case Great Western Bank has filed its unsecured Proof of Claim No. 4 in the amount of $3,489,156.50. The Debtor is unconditionally obligated to Great Western Bank for the allowed amount if its claim.

5. Proof of Claims No. 6 for $952,964.03, No. 7 for $527,381.68 and No. 8 for $306.791.65 have been filed by the Klens and Angry Beavers LLC ("Creditor(s)"). They claim a total aggregate amount owed of $1,787,137.30 in this case.

6. The three LLC entities have filed an adversary proceeding against the Klens and Holestein Self Service Storage LLC, Adversary Proceeding No. 20-01262, setting forth claims of fraud and misrepresentations, among others. The defendants in that adversary proceeding have sought both dismissal and removal of that proceeding to United States District Court. The outcome of that litigation may result in the disallowance, in whole or in part, of the Creditor(s) claims asserted in the LLC entities cases, as well as providing for an offset against any allowed claims amounts. The Debtor is not a party to that litigation. However, the outcome of the adversary case may provide a further basis for full or partial disallowance of the Creditor(s)' claims filed in this case.

7.      The liability of this Debtor to the Creditor(s) on the underlying Proofs of Claims filed herein is tied directly to the purchase of the Front Range Gun Club in April of 2017 and was occasioned by the inequitable conduct and unclean hands of this Creditor, in whole or in part. As a court of equity this Court is asked to disallow Proof of Claim Nos. 6,7, & 8 as a result of the unclean hands and inequitable conduct of the Creditor(s) who hold those claims.

8.      The Creditor(s) has fully subordinated its claim(s) to the claims of Great Western Bank pursuant to the April 26, 2017 Subordination Agreement signed by this Creditor and Great Western Bank, see **Exhibit "1"** hereto. The Subordination Agreement provides for full payment subordination as opposed to mere lien, subordination. The Creditor(s) is effectively 'out of the money' and as such has no allowable claim in this proceeding.

## II.      Unclean Hands of Claimant and Disallowance of Claims.

9.      It is well established that the allowance or disallowance of a claim in bankruptcy is a matter of federal law that is left to the bankruptcy court's exclusive exercise of its equitable powers. *Katchen v. Landy*, 382 U.S. 323, 329–30, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966) (The bankruptcy court is "expressly granted [the] power to 'allow,' 'disallow' and 'reconsider' claims, which is of 'basic importance in the administration of a bankruptcy estate.' " (internal citation omitted); *Canal Corp. v. Finnman*, 960 F.2d 396, 404 (4th Cir. 1992) (The existence of a claim is controlled by state law, but the "allowance or disallowance of a claim in bankruptcy is a matter of federal law left to the bankruptcy court's exercise of its equitable powers.").

10.     The Court's authority to determine claims includes the "full power to inquire into the validity of any alleged debt or obligation of the bankrupt upon which a demand or a claim against the estate is based. This is essential to the performance of the duties imposed upon [the Court]."

*Lesser v. Gray*, 236 U.S. 70, 74, 35 S.Ct. 227, 59 L. Ed. 471 (1915) ; see 11 U.S.C. § 502(b)(1) (If an objection to a claim is made, "the court ... shall determine the amount of such claim....").

11. A bankruptcy court may disallow a creditors claim based solely upon that creditor's pre-petition inequitable conduct or unclean hands. A case directly on point is *In Re: New Valley Corporation* 181 F.3d 517 (3d Cir. 1999), relying upon the Supreme Court's "unclean clean hands" analysis in *Keystone Driller Co. v. General Excavating Co.,* 290 U.S. 240 (1933). *In New Valley*, a trustee objected to a proof of claim filed by an accountant on the grounds that the accountant engaged in inequitable conduct and had unclean hands. The 3rd Circuit recognized the ability to object on equitable grounds and identified five elements that must be present to warrant application of unclean hands against a party sufficient to disallow that proof of claim.

12. The doctrine is applicable when: 1) a party seeking equitable relief; 2) is guilty of conduct involving fraud, deceit, unconscionability, or bad faith; 3) directly related to the matter in issue; 4) that injures the other party; and 5) affects the balance of equities between the litigants. Id at 525-526. The Court in *New Valley* ultimately held that the alleged inequitable conduct of the accountant and the asserted claim were too remote in circumstances to warrant disallowance of the claim.

13. In the present case, all five elements are present. As described below, the claims filed by the Creditor(s) all emanate directly from the sale of the Front Range Gun Club in April of 2017 and the fraud, deceit, unconscionability, or bad faith of the Creditor(s) in inducing the Debtor to become personally obligated to the Creditor(s), who now is seeking to benefit from that conduct in an combined amount of over $1.7 million dollars. This Court should use its powers to disallow Proof of Claim No. 8

### III. Facts Evidencing Unclean Hands and Inequitable Conduct.

14. In support of the inequitable and unconscionable conduct of the Creditors the Debtor shows the Court the following:

1. As the owners and operators of the Business prior to its sale to the LLC entities and the Debtor, the Creditor(s) had intimate knowledge of the Business, including its operation, inventory, and finances.

2. Diverse Construction, Inc. was the general contractor for the construction of the building in which the Business is located.

3. Diverse Construction, Inc. is owned and operated by Creditor(s) Edward Klen and Steven Klen.

4. As the owners and operators of the Diverse Construction, Inc. Creditor(s) Edward Klen and Steven Klen had intimate knowledge of the property and building in which the Business is located.

5. During Debtors and Creditor(s) presale discussions and negotiations, Edward Klen and Steven Klen made numerous false representations about the Business to the Debtor.

6. Creditor(s) made these representations based upon their intimate knowledge of the Business.

7. Creditor(s) made false representations as to the financial health of the Business.

8. Creditor(s) made false representations as to the membership numbers and growth potential of the Business.

9. Creditor(s) made false representations as to the quality and quantity of the Business's tangible property.

10. Creditor(s) made false representations as to the quality and quantity of the Business's inventory.

11. Creditor(s) falsely represented that the Business's upstairs trap was of a certain quality and capable of handling a certain caliber of ammunition.

12. Creditor(s) falsely represented that the Business's downstairs trap was of a certain quality and capable of handling a certain caliber of ammunition.

13. Creditor(s) falsely represented that the Business's elevator could be upgraded for commercial use.

14. These representations were made by Creditor(s) to Debtors for Debtors' use in determining if Plaintiffs would buy the Business and under what terms.

5

15. Debtor relied upon Creditor(s)' representations when making the decision to purchase the Business and under what terms.

16. Given Creditor(s) owned and operated the Business, Plaintiffs' reliance upon Defendants' representations regarding the Business was justified.

17. After purchasing the Business, Debtor discovered that many of Creditor(s)' representations were false or misleading.

18. Creditor(s)'representation of the Business's financial health was false or misleading.

19. In reality, the profitability of the Business was in decline leading up to the sale.

20. Knowing that the financial figures for 2016 were significantly worse than previous year, Creditor(s) failed to disclose to Plaintiffs any information regarding 2016's financials.

21. Creditor(s) representation that membership numbers were continuing to increase was false or misleading.

22. In reality, membership growth had slowed and was significantly declining in 2016.

23. The Business is also part of an HOA.

24. This HOA is responsible, inter alia, for the maintenance of the property on which the Business is located.

25. Since purchasing the Business, Debtor has noticed a decline in the amount and quality of maintenance the Business and property have received.

26. The road, sidewalk, and curbs near the entrance of the Business are deteriorating.

27. An external drain spout is inadequate and has improper drainage, causing water to pool and, in the winter, creates an ice hazard.

28. The Business's external stairs and balcony are deteriorating, and hazardous in winter.

29. The HOA will not allow signs for the Business on the main road.

30. However, the HOA does allow other HOA businesses, The Garden Room and NAI Affinity, to have their signs on the main road.

31. Edward Klen is the head of the HOA.

32. Edward Klen and Steven Klen, collectively, control a majority of the HOA board.

33. Citing alleged safety issues and their HOA authority, Creditors Edward Klen and Steven Klen, on at least one occasion, also ordered the shutdown of the Business's upstairs trap during the LLCs' ownership.

34. Creditor(s) Edward Klen and Steven Klen further threateened to report these alleged safety issues regarding the upstairs trap to OSHA.

6

35. The Business's upstairs trap was custom designed, engineered, fabricated, and installed during Creditor(s)' ownership of the Business.

36. The upstairs trap was custom built and designed, engineered, fabricated, and installed, in part, by Creditor(s) Edward Klen and Steven Klen.

37. Debtor had no involvement with the upstairs trap's construction or design.

38. Creditor(s) claimed the upstairs trap contained a proprietary design and was patent pending.

39. Creditor(s) refused to allow Plaintiffs to inspect the upstairs trap prior to Plaintiffs' purchase of the Business.

40. Creditor(s) represented that the upstairs trap was fully functional and compliant with necessary regulations.

41. Creditor(s) also represented that the upstairs trap was capable of handling the same caliber of ammunition as the downstairs trap.

42. Debtor's own post-purchase review of the upstairs trap revealed that Creditor(s)' presale representations regarding the condition and capacity of the upstairs trap were false.

43. The materials used to construct the upstairs trap are not rated to be capable of handling the caliber ammunition that Creditor(s)' represented the upstairs trap could handle.

44. The upstairs trap could only handle low power calibers, instead of the represented .50 caliber.

45. The upstairs trap utilized ¼" AR 400 steel instead of the represented 3/8" A R 500 Steel.

46. Existing repairs and damage to the upstairs trap also demonstrates that Defendants knew of the safety issues and caliber limitations prior to Plaintiffs' purchase of the Business.

47. The LLC Debtor(s) have had to limit the caliber of ammunition that customers can use in the upstairs trap.

48. The upstairs trap has needed extensive repair work multiple times after the purchase by the Debtors.

49. The LLC entities have had to shut down the trap, in addition to the HOA shutdown, to repair the upstairs trap.

50. Customers have expressed concern and lost confidence due to the numerous shutdowns of the upstairs trap and its caliber limitations.

51. The upstairs trap's shutdowns and caliber limitations has significantly impacted the Business.

52. Creditors also represented that the upstairs trap was adequately supplied with acoustical tiling for noise.

53. However, the upstairs trap's sound suppression is inadequate and creates excessive noise when the range is in use.

54. Maintenance of the upstairs trap is also hazardous due to the design.

55. Creditors also failed to disclose that the upstairs windows are not suitable for use in a gun range.

56. Creditors' representations as to the quality of the Business's downstairs trap were also false or misleading.

57. The downstairs trap was designed by a company called Savage Range System.

58. After purchasing the Business, Debtor consulted with representatives of Savage Range System regarding the downstairs trap.

59. During this consultation, Debtor discovered that Creditor(s) had not maintained the downstairs trap in accordance with Savage Range System's specifications.

60. They also discovered that the material used to construct the trap was not rated for the caliber of ammunition Creditor(s) represented that the downstairs trap was capable of handling.

61. Creditor(s)' representation that the elevator could be upgraded was false or misleading.

62. After purchasing the Business, the Debtor(s) contacted the manufacturer of the elevator.

63. The manufacturer informed Debtor that the hoist way was not big enough to accommodate a commercial elevator, that the pit was not deep enough, nor was the overhead tall enough.

64. Creditor(s) also omitted or failed to disclose that the HVAC system did not have adequate capacity to properly service the square footage of Business.

65. The range HVAC was designed to draw air in through the structure of the trap thereby drawing in significant amounts of lead dust into the exhaust filters.

66. This lead dust significantly reduces the life of the filters and increases the cost of operation of the range HVAC.

67. The design of the trap and HVAC also forces lead into other areas of the Business.

68. The price the LLC entities paid Creditor(s) for the inventory, based upon Creditor(s)' representations as to the quality and quantity of the inventory, significantly exceeds the inventory's fair market value.

69. Much of the firearm and ammunition inventory had depreciated beyond what was represented by the Creditor(s).

70. Upon information and belief, the quantity and types of inventory Creditors delivered to Debtors was below the quantity that Creditor(s) represented existed.

71. Additionally, during an ATF audit of the Business, there were multiple violations attributable to Creditors' operation of the Business.

72. The ATF audit found the unauthorized removal of firearms from the Business by Steven Klen and Edward Klen.

73. The audit found that Creditor(s) did not properly process and document firearm sales.

74. The audit found that Creditor(s) did not properly report all firearm sales placing the federal firearms license in danger or adverse action.

75. The sale of the Front Range Gun Club eliminated over $3.4 million in debt owed by the Creditor and their affiliated entity, Holstein Self Service Storage LLC, to Great Western Bank. At the same time, the Debtor incurred over $3.4 million in debt to Great Western Bank, and over $1.7 million to these Creditor(s) as a result of the transaction.

### IV. Improper Reservation of Right.

15. The proofs of claim filed herein each include an improper reservation of rights, a statement that the filer of the POC does not submit to the jurisdiction of the Bankruptcy Court and does not waive the right to a jury trial.

16. The Creditor(s) may not file a proof of claim and then attempt to have another court or venue determine the amount and validity of that claim, which is what the reservation of rights clearly attempts to do.

17. Every person submitting himself to the jurisdiction of the bankrupt court [sic] in the progress of the cause, for the purpose of having his rights in the estate determined, makes himself a party to the suit, and is bound by what is judicially determined in the legitimate course of the

proceeding. A creditor who offers proof of his claim, and demands its allowance, subjects himself to the dominion of the court, and must abide the consequences. *Wiswall v. Campbell*, 93 U.S. 347, 351, 23 L.Ed. 923 (1876).

18. Confirmation of a chapter 11 plan and the allowance or disallowance of claims against the bankruptcy estate are, as a matter of law, core matters that arise under the Bankruptcy Code. See 28 U.S.C. § 157(b)(2)(B), (L), and (O) ("Core proceedings include, but are not limited to ... allowance or disallowance of claims against the estate ... confirmations of plans ... [and] other proceedings affecting ... the adjustment of the debtor-creditor ... relationship."); see also *Celotex Corp. v. Edwards*, 514 U.S. 300, 308, 115 S. Ct. 1493, 131 L.Ed.2d 403 (1995) ("Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate."). Indeed, one of the primary purposes of a bankruptcy proceeding is "to centralize disputes over debtor's assets and obligations in one forum, thus protecting both debtors and creditors from piecemeal litigation and conflicting judgments." *Moses v. Cash Call, Inc.*, 781 F.3d 63, 72 (4th Cir. 2015).

19. Once a claimant has submitted to this Court's equitable jurisdiction by triggering the claims allowance process, there is no Seventh Amendment right to a jury trial. *Langenkamp v. Culp*, 498 U.S. 42, 44-45, 111 S.Ct. 330, 112 L.Ed.2d 343 (1990) (Parties who file claims against the bankruptcy estate bring themselves within the equitable jurisdiction of the Bankruptcy Court and waive the right to a jury trial.); *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989) (same); *Katchen v. Landy*, 382 U.S. at 336-337, 86 S.Ct. 467 ("[A]lthough petitioner might be entitled to a jury trial ... if he presented no claim in the bankruptcy proceeding and awaited a federal plenary action by the trustee, when the same issue arises as part of the process of allowance and disallowance of claims, it is triable in equity ... and as the

proceedings of bankruptcy courts are inherently proceedings in equity, there is no Seventh Amendment right to a jury trial for determination of objections to claims ...." (internal citations omitted) ).

20.  The Bankruptcy Code and Rules provide the exclusive mechanism for claims allowance or disallowance. Pursuant to § 502(a) of the Bankruptcy Code, a proof of claim is deemed allowed unless an objection is filed. Section 502(b) provides that if an objection to a claim is made, the court, after notice and a hearing, shall determine the amount of the claim as of the date of the petition, and shall allow such claim in that amount, unless the claim is disallowed under exceptions listed in the Bankruptcy Code, including that the "claim is unenforceable against the debtor and property of the debtor, under any agreement or applicable law...."

21.  In the present matter, Debtor's Objection challenges the amount and enforceability of the Proof of Claim, as filed, including the asserted interest, attorney's fees and costs. These grounds are substantive equitable based challenges to the Claim that go directly to the validity, amount, and enforceability of the Claim. See generally *In re Pursley*, 451 B.R. 213, 231–32 (Bankr. M.D. Ga. 2011) ("[I]t is a substantive objection if a party claims not to owe money to another party; that goes directly to the validity of the claim.") (citing *In re King*, C/A No. 08-13152-SSM, 2009 WL 960766, at * 5 (Bankr. E.D. Va. April 8, 2009) ); *In re Schmale*, 08-3315-JW, slip op. at 2 (Bankr. D.S.C. April 28, 2009); *In re Cleveland*, 396 B.R. 83, 93 (Bankr. N.D. Okla. 2008) ("In the face of a substantive objection by a party in interest, the Court is required to determine the amount of each claim as of the petition date, and to allow the claim in that amount, except to the extent the claim is unenforceable against the debtor or the debtor's property under applicable law. Claimants therefore must first establish that they hold enforceable claims against the respective Debtors.").

22. The fact that the Debtor would dispute the Creditor(s)' proofs of claim should be on no surprise to the Creditor. The claims are listed as unliquidated and disputed in the Debtor's schedules. Contingent claims are still claims under § 101(5), and claimants are entitled to adequate notice if the debtor knows of the claims.). However, such a scheduling was not Debtor's admission of liability to the Creditor(s) nor is it a promise for payment. *See Harford Sands*, 372 F.3d at 642 (holding that acknowledgement of the debt "does not prove how the debt arose"); *In re Vaughn*, 536 B.R. 670, 678 (Bankr. D.S.C. 2015).

### V.  Intercreditor Subordination Agreement

23. The Creditor(s) has fully subordinated its claim(s) to the claims of Great Western Bank pursuant to the April 26, 2017 Subordination Agreement signed by this Creditor and Great Western Bank, see **Exhibit "1"** hereto. The Subordination Agreement provides for full payment subordination as opposed to mere lien, subordination. The Creditor(s) is effectively 'out of the money' and as such has no allowable claim in this proceeding and no standing to object to Plan confirmation.

24. The Debtors' Plan as filed respects the intercreditor subordination agreement, which is enforceable between the parties to the agreement. Code section 726(a) expressly states that this distribution scheme is subject to section 510 of the Bankruptcy Code. Section 510(a) provides that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." See Collier on Bankruptcy ¶ 510.03 (16th ed. 2019).

25. There are two types of subordination agreements, generally recognized as lien subrogation and payment subordination. Under a lien subordination agreement, to the extent that there is value derived from agreed-upon collateral, the senior lender is paid first, up to the extent

of its secured claim. If there are insufficient proceeds from this collateral, the senior lender would be entitled to a pro rata share of any remaining assets the borrower may have, along with other under-secured and unsecured creditors. Payment subordination, by contrast, is a more fundamental form of subordination where the senior lender's right to payment is agreed to be superior to the junior creditor's right to payment.

26. The Subordination Agreement, **Exhibit "1"** provides in part as follows:

C. For purposes of this Agreement, all principal, interest, fees, costs, enforcement expenses (including costs and reasonable attorneys' fees), collateral protection expenses, reimbursement and indemnity obligations, together with any other indebtedness, liabilities or obligations owing under, created by, arising from or relating to the Subordinated Loan Documents shall be referred to as the "Subordinated Debt."

2. Subordination. All Subordinated Debt owing by Borrower to Subordinated Lender is and shall be subordinate in all respects to all Senior Debt owing by Borrower to Senior Lender. Furthermore, Subordinated Lender also subordinates its Subordinated Security Interest and all Subordinated Security Interest Documents to the Senior Security Interest and Senior Security Interest Documents of Senior Lender, whether the Senior Security Interest exists now or is acquired later. As a result, the Senior Lender's Senior Security Interest in the Collateral shall unconditionally be, and remain at all times, a lien or charge against the Collateral prior and superior to the lien or charge of the Subordinated Lender's Subordinated Security Interest. The Subordinated Lender agrees to execute such other documents as Senior Lender may request from time to time to further evidence this subordination. Furthermore, the Subordinated Lender authorizes the Senior Lender to file a UCC Financing Statement Amendment for any previous UCC filing made by Subordinated Lender to evidence this subordination in the public records. This Agreement shall not apply to future extensions of credit from Senior Lender to Borrower which are not related to the Senior Debt in any way; provided, however, this Agreement shall apply to all extensions, renewals, modifications, refinances and substitutions of the Senior Debt or any obligations arising out of the Senior Loan Documents.

27. The Creditor(s) is not entitled to receive any distributions on its Proof of Claim No. 8 until Great Western Bank has been paid, in full. Great Western Bank holds the unconditional guarantee of the Debtor has filed its own Proof of Claim in this Case No. 4 in the amount of

$3,489,156.50. Since the allowed claim of Great Western Bank will not be paid in full, but will in fact receive a small percentage on the dollar, the Creditor(s) has no actual dollar claim upon which Plan payments can be made under the terms of the intercreditor Subordination Agreement. The claim should be disallowed.

### VI. Right of Set off or Recoupment in Bankruptcy

28. Setoff is an equitable right of a creditor to deduct a debt it owes to the debtor from a claim it has against the debtor arising out of a separate transaction. Recoupment differs in that the opposing claims must arise from the same transaction. *4 Lawrence P. King, Collier on Bankruptcy* ¶ 553.03 (15th ed. 1991). The debts claimed by these Creditor(s), and the damages claims that may exists in favor of the Debtor, all spring from the same transaction and series of events. There is a clear mutuality of obligation under these facts.

29. The Code codifies and governs setoff but is silent as to recoupment. See *In re B&L Oil, 782 F.2d 155* (10th Cir. 1986); 11 U.S.C. § 553. Setoff is available in bankruptcy only when both the opposing claims arise on the same side of the time line described by the petition's filing; i.e., both must be prepetition claims or both must be post petition claims. Recoupment is not so limited. See generally I*n re Davidson Lumber Sales, Inc., 66 F.3d 1560, 1566-68 (*10th Cir. 1995) (general contractor who pays a bankruptcy subcontractor's suppliers or materialmen may setoff this payment against its debt to the subcontractor).

30. Bankruptcy courts may also grant setoff on equitable grounds even if no mutuality of debt exists. Accord, *Gray v. Rollo*, 85 U.S. 629 (1873); *In re Sherman Plastering Corp.*, 346 F.2d 492 (2d Cir. 1965); *Modern Setting v. Prudential-Bache Sec.*, 109 B.R. 605 (S.D.N.Y. 1989).

31. In the present case, the distinction has little practical impact. Any amounts owed by the Creditors to the Debtor for damages, if any are awarded, are an offset against any claims of the Creditor(s). The right of setoff "… allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding 'the absurdity of making A pay B when B owes A." *Citizens Bank of Maryland v. Strumpf*, 116 S. Ct. 286, 289 (1995) (quoting *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 528 (1913)). Setoff "occupie[s] a favored position in our history of jurisprudence," *Bohack Corp. v. Borden, Inc.*, 599 F.2d 1160, 1164 (2d Cir. 1979), with which courts should interfere "only under the most compelling circumstances." *In re Utica Floor Maint., Inc.*, 441 B.R. 941, 944 (N.D.N.Y. 1984). "The rule allowing setoff ... is not one that courts are free to ignore when they think application would be unjust." *In re Applied Logic Corp.,* 576 F.2d 952 (2d Cir. 1978). To the contrary, "the justification for permitting setoff is based on notions of fairness," *In re IML Freight, Inc.,* 65 B.R. 788, 791-92 (Bankr. D. Utah 1986), and "[t]he primacy of setoffs is essential to the equitable treatment of creditors. ... Absent a setoff, a creditor ... is in the worst of both worlds: it must pay its debt to the debtor in full, but is only entitled to receive a tiny fraction of the money the debtor owes it. It was to avoid this unfairness that setoffs were allowed in bankruptcy in the first place." *In re DeLaurentiis Entertainment Group, Inc.*, 963 F.2d 1269, 1277 (9th Cir. 1992).

32. In the event that the Court fails to disallow the Proofs of Claim as requested herein due to the unclean hands of the Creditor(s), the Debtor reserves the right to seek further relief by way of exercising the right of setoff, or recoupment, as may be available.

    **VII.   Marshaling of Collateral – Angry Beavers LLC's Deficiency Claim No. 8**

33. The doctrine of marshaling is commonly known as the "two funds" doctrine. *In re Corso Stein Enters. Inc.*, 79 B.R. 584, 587 (Bankr. D. N.J. 1987). "The Supreme Court has noted that "[t]he equitable doctrine of [marshaling] rests on the principle that a creditor having two funds to satisfy his debt may not, by his application of them to his demand, defeat another creditor who may [have] resort[ed] to only one of the funds.'"

34. Marshaling is not limited solely to disputes between creditors. It has been applied against non-debtor shareholders solely for the equitable purpose of preserving a distribution for the debtor's unsecured creditors. *Berman v. Green (In re Jack Green's Fashions for Men Big & Tall Inc.)*, 597 F.2d 130, 133 (8th Cir. 1979) ("[I]t would be in the highest degree inequitable to allow the bank to exhaust the business assets of the corporate bankrupt without first looking to the [shareholders'] real estate mortgaged to it. To permit such a course would leave the general creditors of the business with nothing.").

35. Courts have also invoked marshaling where the non-debtor has engaged in inequitable conduct such as fraud, breach of fiduciary duty or unjust enrichment. See, *In re Field*, 226 B.R. 178, 183 (Bankr. D. S.C. 1998); and *Fundex Capital Corp. v. Balaber-Strauss* (In re Tampa Chain Co.), 53 B.R. 772, 778-80 (Bankr. S.D.N.Y. 1985).

36. In the present case, Angry Beavers LLC Proof of Claim No. 8 is unsecured in this proceeding, but it is allegedly secured by a subordinated second deed of trust position to Great Western Bank in certain assets of the LLC entities. See Proof of Claim No. 8 filed by Angry BeaverS LLC in the LLC entity cases.

37. Before receiving any payments in this Debtor's case, Angry Beavers LLC should first exhaust all if its opportunity for payments under its deed of trust position. In order to preserve payments for other unsecured creditors in this case, and in recognition of the senior payment position of Great Western Bank, it is equitable to marshal the claims of Angry Beavers LLC, first to the estate in which it alleges it holds a secured position, and second to this Debtor's estate.

WHEREFORE, the Debtor moves the Court to disallow, in whole or in part, Proof of Claim No. 8 filed herein, for such further relief as sought herein, and for such further relief as is just and appropriate under these circumstances.

DATED: February 9, 2021

Respectfully submitted,

BUECHLER LAW OFFICE, L.L.C.

*/s/ Michael J. Guyerson*

Michael J. Guyerson, #11279
999 18th Street, Suite 1230-S
Denver, Colorado 80202
Tel: 720-381-0045
Fax: 720-381-0382
mike@kjblawoffice.com
ATTORNEY FOR DEBTOR